**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| BIAX CORPORATION | § | |
| | § | |
| vs. | § | CASE NO. 2:06-CV-364 |
| | § | |
| SUN MICROSYSTEMS, INC. | § | |

**MEMORANDUM OPINION & ORDER**

**1.  Introduction**

In this case, Biax Corporation ("Biax") asserts various claims of two patents against Sun Microsystems, Incorporated ("Sun"). The asserted patents are U.S. Patent Nos. 5,517,628 ("the '628 patent") and 6,253,313 ("the '313 patent") (collectively "the patents-in-suit"). The patents-in-suit are related and share a common written description.[1] This opinion resolves the parties' various claim construction disputes. The court will address briefly the technology at issue in the case, then turn to the merits of the claim construction arguments.

**2.  Background of the Technology**

Some aspects of the technology have been previously considered in *Biax Corporation v. Intel Corporation and Analog Devices, Inc.*, 2:05-CV-184. In general terms, the patents are directed to a parallel processor computer system. Specialized software, referred to as TOLL software, analyzes the output of a conventional compiler and adds intelligence to the instructions to facilitate the processing of the instructions. Instructions that are mutually independent from one another and can be processed at the same time, or in parallel, are referred to as "naturally concurrent" instructions.

---

[1] The '313 patent issued from a patent application that was filed as a divisional application and based on the application that underlies the '628 patent. For clarity, all citations to the written description of either patent will be made to the '628 patent.

After analyzing the compiler output, the software assigns information to the output. In the preferred embodiment, the information includes an "instruction firing time" a "logical processor number," and "shared context storage management information." The instruction firing time ("IFT") identifies the time that the instruction will be executed by the processors. The logical processor number ("LPN") identifies the processor that will execute the instruction. The shared context storage management ("SCSM") information identifies information concerning the context file and the register level at which the program is operating.

The patents also disclose hardware for use with the system. Figure 6 of the patents illustrates these hardware components at a high level. The components are all interconnected through full-access networks. The components include memory resources, logical resource drivers, processor elements, and shared context storage files. In the preferred embodiment, the processor elements are all identical, and they execute all of the instructions, except branch instructions. A branch instruction changes the sequential instruction flow in a program by jumping to another section in the program. As depicted in Figure 6, a separate branch execution unit, or BEU, handles these types of instructions. The use of the specialized software, in conjunction with the hardware features of the system, facilitates the parallel processing of instructions.

At issue in the present case are various aspects of the software and hardware system described in the patents. The parties dispute the extent to which the claims asserted in this case require features of the system depicted in Figure 6. To illustrate the claim construction disputes, Sun contends that the "instructions" referred to in claim 1 of the '628 patent require the intelligence added to the compiler output by the TOLL software. Likewise, Sun contends that the general purpose registers and the condition code registers set forth in claim 1 must be accessible from all

2

processor elements, as depicted in Figure 6.  For its part, Biax contends that the claims describe multiple inventions shown in the specification and that the claims asserted in this case are drawn to cover inventions other than the hardware interconnections shown in Figure 6 or the addition of intelligence by the TOLL software.

Claim 1 of the '628 patent states:

1.      A computer comprising:

a general purpose register file comprising at least two general purpose registers;

a condition code register file distinct from said general purpose register file, having a plurality of addressable condition code registers, each condition code register for representing a condition code value as a small number of bits summarizing the execution or result of a previously-executed instruction;

a processor element configured to execute instructions, including condition-setting instructions that each provide a condition code value for storage in one of said condition code registers.

a branch execution unit configured to execute conditional branch instructions that each determine a target instruction for execution based on analysis of a condition code value from one of said condition code registers; and

a condition code access unit configured to act in response to condition-selecting instructions, at least one of said condition-selecting instructions being one of either said condition-setting instructions or said conditional branch instructions, said condition-selecting instructions for selecting from said condition code register file a condition code register for at least one of:

storing into said selected condition code register a condition code value produced by one of said condition-selecting instructions, and

fetching from said selected condition code register a condition code value for analysis by one of said conditional branch instructions;

said selecting being by direct addressing on a condition code address field of the condition-selecting instruction.

In addition to claim 1 of the '628 patent, Biax asserts various other claims from the '628 and

the '313 patents. After reviewing the claims, the specification, and the prosecution history, the court is persuaded that Biax's position–that the claims do not all require the added intelligence of the TOLL software and the features of the system shown in Figure 6–is closer to correct as a general matter. As a result, the court's constructions do not incorporate extraneous limitations found in other claims specifically drawn to such features. Moreover, although Sun contends that the court should avoid construing the claims in light of the corrected specification, the court rejects that position for essentially the reasons stated in the *Intel* matter. Bearing this background in mind, the court will address the claim construction disputes.

**3.      General Principles Governing Claim Construction**

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.* as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary

skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the

6

invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to

7

the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

**4.    Discussion**

    **A.    first circuit; second circuit; access circuit**

Claim 3 of the '313 patent recites various circuit limitations. In particular, the claim recites "a first circuit coupled to said opcode storage, said first circuit configured to . . . ." The claim also requires a "second circuit coupled to said opcode storage, said second circuit configured to . . . ." Finally, the claim recites "an access circuit coupled between said condition storage and said second circuit, said access circuit configured to . . . ." '313 patent, claim 3.

Biax contends that these terms do not require construction. Sun's proposed construction for "first circuit" is a "device that is capable of interpreting and executing instructions." Its proposed construction for "second circuit" is a "component outside the processor elements that executes only branch instructions." Sun equates these two limitations to the processor element and the branch execution unit, respectively. Finally, Sun's proposed construction of "access circuit" is "component that determines whether the condition code value is fetched or delivered based on an instruction field."

The intrinsic record counsels against Sun's proposed constructions. On its face, the term "circuit" is broader than Sun's proposed definitions. Moreover, there is no basis to limit the claims, as implied by Sun's construction, to systems having multiple processor elements. Other claims in the '313 patent specifically refer to "a plurality of processor elements." '313 patent, claim 1. Moreover, dependent claim 2 includes the processor element limitation as well as the first, second, and access circuit limitations. '313 patent, claim 2. As a result, the court rejects Sun's proposed

8

limitations. The court defines "circuit" to mean "an assemblage of electronic elements." The balance of the terms do not require construction.

### B.     branch execution unit; branch unit

The term "branch execution unit" is present in claim 1 of the '628 patent. The term "branch unit" is present in claim 15 of the '628 patent. The parties agree that these terms have the same meaning and the court will consider them together. Biax suggests that each term means "a unit that executes branch instructions." Sun contends that each term means a "component outside the processor elements that executes only branch instructions."

The dispute between the parties is whether the claim covers only a system that includes a branch execution unit that executes "only" branch instructions "separate and apart" from the processor elements. Sun's proposed construction finds support in the written description, *see, e.g*, Fig. 15. And, although the court concludes that the claims are not limited to the preferred embodiment, the applicants specifically drew other claims to the type of system contemplated by Biax's construction. For instance, other claims of the '628 patent explicitly contemplate the execution of both branch and non-branch instructions by a single processor or processor element. *See* '628 patent, claim 27 ("The method of claim 25 wherein the steps of executing said first condition setting instruction and said first conditional branch instruction are performed by a first processor element"); '628 patent, claim 16 ("A processor configured to execute instructions, the instructions including: arithmetic or logical instructions . . . and conditional branch instructions."). Although the court is not persuaded that Sun's limitations are entirely appropriate, the claim term at issue is a "branch execution unit," and the patent describes and shows a unit distinct from the processor element that executes branch instructions, as opposed to arithmetic or logical instructions.

In view of the intrinsic record, the court construes the term to mean "a unit distinct from the processor element(s) for executing branch instructions."

    **C.**    **general purpose register; general purpose register file**

        **1.**    **general purpose register**

This term is present in claims 1, 9, and 16 of the '628 patent. Biax's proposed construction of this term is "a register that can be used for different purposes." Sun's counter-construction is a "register that is accessed by all processor elements." The court rejects Sun's proposed construction on the grounds that it is inconsistent with how one of skill in the art would understand the term and adds limitations not required by these claims. A "general purpose register" is a "register that can be used for different purposes."

        **2.**    **general purpose register file**

This term is present in claims 1 and 16 of the '628 patent, and in claim 12 of the '313 patent. Biax's proposed construction of this term is "a collection of multiple general purpose registers." Sun's counter-construction is a "collection of multiple registers that are accessed by all processor elements." The court adopts Biax's proposed construction.

    **D.**    **condition code register; condition code register file; condition storage**

        **1.**    **condition code register**

This term is present in various asserted claims of the '628 patent. Biax's proposed construction of this term is "a register that holds a condition code value." Sun's proposed counter-construction is a "register that is accessed by all processor elements and only holds a condition code value." The court rejects Sun's proposed limitation that the register must be accessible by all processor elements. Aside from this limitation, at the claim construction hearing, both parties

indicated agreement with the court's proposed construction of "a special purpose register for storing a condition code." As such, the court adopts that construction for the term "condition code register."

### 2. condition code register file

This term is present in various asserted claims of the '628 patent. Biax's proposed construction of this term is "a collection of multiple condition code registers." Sun's proposed counter-construction is a "collection of multiple registers that are accessed by all processor elements and only hold condition code values." Sun's proposed limitations are rejected. The court adopts Biax's proposed construction. In doing so, the court incorporates by reference the prior construction of "condition code register."

### 3. condition storage

This term is present in claims 3, 12, and 19 of the '313 patent. Biax's proposed construction of this term is "a location that is used for holding a condition code value." Sun's counter-construction is a "set of registers that are accessed by all processor elements and that only hold condition code values." The court rejects both parties' constructions. Biax's construction is too broad, because it includes any "location" used for holding a condition code value. Sun's construction is overly narrow, as it is restricted to registers. Although Sun contends that the patentee used the term "storage" as a synonym for register, the court's reading of the specification counsels it otherwise. The patentee used the term "register" as a type of storage, and deliberately chose the broader term "storage" in these asserted claims. The court defines "condition storage" to mean "a memory location for holding a condition code value."

### E. register

This term is present in various claims of the '628 patent. Biax's proposed construction of

this term is "a storage for temporarily holding data." Sun's proposed construction is a "specialized storage element that consists of several flip-flops." Again, the court rejects both parties' constructions. As understood in the art, a "register" refers to a specialized type of high speed processor memory. The extrinsic definitions from the relevant time period define the term as "a specialized storage element of the CPU that consists of several flip-flops or of some other kind of digital storage element." *Encyclopedia of Computer Science and Engineering* 2d Ed. 1983 at 1277-78. As a result, the court adopts this construction in lieu of the parties' proposals.

### F.     computer

This term is present in various asserted claims of the '628 patent. Biax contends that this term does not require construction, but alternatively suggests that this term should be construed to mean "a device that receives, processes, and presents data." Sun's proposed construction of this term is a "system with memory, logical resource drivers, processor elements, and registers. The dispute between the parties is whether the computer of the '628 patent is limited to the preferred embodiment shown–i.e., one with memory, LRDs, processor elements, and registers. The court rejects Sun's limitation. Although the term "computer" might not ordinarily need construction, in view of the parties' dispute, the court adopts Biax's construction as the correct one.

### G.     address for storing; address input; address selection circuit; condition code address field; condition storage address; addressable; register selection field

Although there are multiple terms relating to the address limitations, the parties have three basic claim construction disputes. First, Sun re-urges its position that storage and register are used synonymously in the patent. Second, Sun argues that the address must identify a specific memory location. Finally, Sun argues that the prosecution history indicates that the address must be used to

12

"access" the location.

The court has previously rejected Sun's position that the patents use the term "storage" as a synonym for "register." Sun's second argument–that an address refers to a specific storage location–is persuasive. As used in the patents, an address refers to a specific storage location. Claim 1 of the '628 patent, for example, requires "a condition code register file distinct from said general purpose register file, having a plurality of addressable condition code registers . . . ." The same claim requires "fetching from said selected condition code register a condition code value," with the "selecting being by direct addressing on a condition code address field of the condition setting instruction." Although Biax contends that the term "address" does not require a specific memory location, Biax has not shown that one of skill in the art would not equate the term "address" with a specific location, particularly in light of the language of the claims.

Sun's third argument is that the term "address" should be construed to require access. Sun argues that the language of the claims and portions of the specification suggest that the address is used for accessing. See '628 patent, claim 1; '313 patent, 38:52-55 (disclosing that the address is used for accessing condition code values"). Moreover, in his reasons for allowance, the examiner stated that the applicants' invention was patentable over the prior art because the prior art did not access the condition storage based on the received address. Specifically, the examiner noted "[t]he prior art does not access the condition storage based upon the received address." '313 File History, 12/05/00 Notice of Allowability and Claims Amendment at 9.

The court rejects Sun's third argument. To the extent other language in the claims requires the use of the address to access condition codes, then Sun's proposed language is superfluous. To the extent it is not, then Sun's argument would improperly import limitations from the preferred

13

embodiment into the claims. As to the prosecution history, the court is not persuaded that the applicants' silence in the face of the examiner's statement compels a finding of estoppel under these facts. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed. Cir. 2005). As such, the court rejects Sun's third argument.

The court construes the term "addressable" as "capable of being specifically identified." The term "condition code address field" means "a portion of the instruction used to identify a specific condition code register." The term "register selection field" means "portion of an instruction used to identify a specific register." The term "condition storage address" means "the specific location for storing a condition code." The term "address selection circuit" means "a circuit that identifies a specific storage location." The term "address input" means "a value used to identify a specific storage location." The term "address for storing means "a value for identifying and storing to a specific storage location."

### H.   opcode storage

This term is present in claims 3 and 16 of the '313 patent. The parties have agreed that "opcode storage" means "memory used to store opcodes."

### I.   condition code access unit

This term is present in claims 1 and 13 of the '628 patent. Biax's proposed construction of this term is "a unit used to access a condition code register." Sun's counter-construction is a "component that determines whether the condition code value is fetched or delivered based on an instruction field."

Neither party has suggested that this term has a well-understood meaning in the art. As such, the court turns to the claims and specification to discern the proper construction of this term. In

claim 1 of the '628 patent, the relevant limitation requires:

> a condition code access unit configured to act in response to condition-selecting instructions, at least one of said condition-selecting instructions being one of either said condition-setting instructions or said conditional branch instructions, said condition-selecting instructions for selecting from said condition code register file a condition code register for at least one of . . . .

'628 patent, claim 1.

The specification explains that the condition code access unit (1920 as shown in the patent) is a part of the branch execution unit. As described with reference to the preferred embodiment, when the branch instruction is loaded into the instruction register 1900, the FETCH-ENABLE portion 1910a of the instruction is delivered to the condition code access unit. The FETCH-ENABLE field of the instruction indicates whether or not the condition code access unit 1920 should retrieve the condition code located at the address stored in the address field or whether the condition code will be delivered by the generating instruction. If a FETCH is requested, then the condition code access unit uses the address furnished to it to access the condition code storage over the register file-PE network. The condition code storage 2000 is accessed and addressed by the unit to retrieve, pursuant to the FETCH request, the necessary condition code. The condition code and an indication that such was received by the access unit is then delivered to the evaluation unit 1930. '313 patent, 38:47-39:2.

The plain language of the claim "a condition code access unit configured to act in response," coupled with the description of the unit in the specification, reveals that Sun's proposed "active" construction is closer to correct. The court construes the term "condition code access unit" to mean "a unit that accesses a condition code register based on an analysis of an instruction field."

**J.    instruction**

This term is present in various claims of the '628 patent. The court previously construed the term "instruction stream" as "a stream of computer instructions," but did not separately construe the term "instruction." Biax's proposed construction of this term is "a machine language or assembly language construct that specifies an operation and identifies its operands." Sun's counter-construction is "executable command having static scheduling information." The parties' dispute is whether the patent claims cover only instructions to which static scheduling information has been added. The court agrees with Biax that the claims at issue are not drawn to the embodiment of the invention exemplified by compiling the instruction stream with the TOLL software. To illustrate, claim 1 of the '628 patent requires "a processor element configured to execute instructions, including condition-setting instructions that each produce a condition code value for storage in one of said condition code registers . . . ." '628 patent, claim 1. By contrast, certain unasserted claims require the addition of the static scheduling information. '313 patent, claim 1 ("means (160) for statically adding intelligence to each instruction." Moreover, as Biax correctly notes, the specification refers in Table 1 to I0-I5 as "instructions" even though they do not include the static scheduling information. '628 patent, 8:27-35. This implies that the term "instruction" does not invariably contemplate the inclusion of the static scheduling information. As such, Sun's proposed construction is rejected, and the court adopts Biax's proposed construction.

**K.    means for executing**

This means-plus-function element is present in claim 15 of the '628 patent. The parties agree that the recited function is "executing the conditional branch instructions concurrently with execution of arithmetic instructions by the processor element." Biax contends that the corresponding structure is "BEU of Figure 19 (excluding the delay elements 1940, 1910d, and delay in 1900)." Sun

16

contends that the corresponding structure is "component outside the processor element that executes only branch instructions with a delay unit for evaluating the delay code in the instruction."

The basic dispute between the parties is whether the delay elements of the BEU of Figure 19 are included in the corresponding structure. The court has carefully reviewed the specification portions cited by the parties, and, contrary to the plaintiff's suggestion, is persuaded that the delay elements form a part of the structure necessary for the concurrent execution of the instructions. As such, the court construes the corresponding structure to be the BEU of Figure 19, including the delay elements.

L.   context; context selector; context value; register context

These terms share common disputes: whether a context is limited to a program or may include activities and also whether the context must be assigned to a particular user. Contrary to Sun's argument, the specification defines the term "context." The specification explains:

> All general purpose computer systems and many special purpose computer systems have operating systems or monitor/control programs which support the processing of multiple activities or programs which support the processing of multiple activities or programs. In some cases this processing occurs simultaneously; in other cases the processing alternates among the activities such that only one activity controls the processing resources at any one time. This latter case is often referred to as time sharing, time slicing, or concurrent (versus simultaneous) execution, depending on the particular computer system. *Also depending on the specific system, these individual activities or programs are usually referred to as tasks, processes, or contexts.*

'313 patent, 3:49-60 (emphasis added). In light of this passage of the specification, the term "context" refers to activities or programs.

Sun also argues that a context must be assigned to a particular user. Sun points to passages describing an embodiment of the invention to urge that a context is a program assigned to a specific

17

user. It is true that the disclosed embodiment illustrates contexts assigned to different individual users. *See, e.g.*, '313 patent, 4:21-22 ("a plurality of context files, one for each user, are provided . . . ."); 14:57-59 ("The diagram of FIG. 6 represents an MIMD system wherein each context file 660 corresponds to at least one user program."). Despite these passages describing the preferred embodiment, the claim language at issue includes no such limitation.

Sun also points to the Examiner's 12/5/00 Notice of Allowability and Claim Amendments to support its construction. The court has reviewed the prosecution history and is not persuaded that the applicants' failure to comment on the Notice of Allowance, under these circumstances, supports the construction sought by Sun. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed. Cir. 2005). The court construes "context" to mean "activities or programs." In view of the court's resolution of the meaning of the term "context," the court adopts Biax's proposed construction of the terms "context selector," "context value," and "register context."

### 5.  Conclusion

The court adopts the above constructions. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the court.

SIGNED this 18th day of July, 2008.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE